## GREENE v. ALMAND.

Sayings of a deceased person can not be rendered competent evidence on a question of pedigree by merely proving that such person said he was a kinsman or relative of the person whose pedigree is the subject-matter of the inquiry. The fact of relationship must be shown by other evidence.

Argued July 21,—Decided August 8, 1900.

Appeal.    Before Judge Reese.    Wilkes superior court. November term, 1899.

John D. Floyd died intestate in Wilkes county, June 23, 1899. R. A. Almand, as the largest creditor, applied for letters of administration upon the estate. A caveat was interposed by T. G. Greene, designated as the choice of Catherine A. Greene, Arabella L. Floyd, and Sophronia Cutten, daughters of Thomas Floyd, deceased, formerly of Putnam county, the caveator being a son of Catherine A. Greene, and these three sisters claiming to be the next of kin of John D. Floyd. The caveat was overruled, and appeal was taken. The caveator admitted that John D. Floyd was never married, and all other facts necessary to make a prima facie case for the applicant. To establish the right of the caveator, it was necessary to prove that Thomas Floyd of Putnam, who married there in 1828 and died there in 1856, was a brother of the intestate's father John Floyd, who formerly lived in Wilkes county, and who had another son, William, born in 1832, who died about 1860, leaving a wife and daughter, both of whom died in 1878. An entry in a family bible indicated that the father of the intestate was born and reared in Virginia near Petersburg, and left there in 1831. The intestate when in life said, several times, that he had no Floyd relatives this side of Virginia; that if he had any relatives in Georgia, he did not know, or had not heard, of them. He was not visited by any relative in his last illness. There was formerly a William Floyd who lived near Petersburg, Va. The following testimony of Mrs. Sarah Floyd Bagley, of Petersburg, Va., was excluded on objection: "William Floyd had two brothers, John and Thomas. They went south to live. I do not know what part of Georgia they went to. I have heard William Floyd mention the names of

these brothers. He said his brother John went south to live." This witness appears to have been sixty-four years old in 1899.

The following testimony of Sophronia Cutten was excluded on like objection: "I always understood that my father was a Virginian, and that he came from Virginia first to Wilkes county, I think, and from there to Putnam county, where he lived and died. When I was a child, two brothers, John and William, visited my father at his home in Putnam county, from Wilkes county. My recollection is that my uncle William's home was in Virginia, that he visited my uncle John in Wilkes, and they joined in a visit to my father. After this visit I never saw my uncles, nor heard much of them. . . The only John Floyd I personally knew in Wilkes county at any time was my uncle John; his son John I never met, nor his other son William. The John and William I met were my uncles, not my cousins." The following testimony of Arabella Floyd was excluded on like objection: "I met my father's nephew, William Floyd, who visited us from Wilkes county to our home in Putnam county in 1852. He remained at our house several months. He often spoke of his brother John Floyd, who lived with him and his father and mother in Wilkes county. He called my father uncle, and the relationship was acknowledged on both sides. He was then about 18 or 20 years of age. I never personally knew any John Floyd of Wilkes county, but have often heard my father speak of a brother John who lived in Wilkes county; and I also heard my father's nephew William Floyd speak of his father John Floyd, and his brother John Floyd, who lived in Wilkes, while he was on a visit to us in 1852." The rulings excluding the foregoing and other similar testimony con. trolled the disposition of the case in favor of the applicant.

*William Wynne* and *T. G. Lawson*, for plaintiff in error.
*Colley & Sims*, contra.

COBB, J. "Pedigree, including descent, relationship, birth, marriage, and death, may be proved . . by the declarations of deceased persons related by blood or marriage." Civil Code, § 5177; *Foster* v. *Brooks*, 6 *Ga.* 293. "Before such declarations, however, can be admitted, the relationship of the declarant to the family must be proved by other evidence than his decla-

rations; for it would be a *petitio principii* to say that his decla-
rations are receivable because he is a member of the family,
and he is a member of the family because his declarations are
receivable." 1 Whart. Ev. § 218. "The *relationship of the
declarant* with the family *must be established* by some proof
*other than the declaration* itself." 2 Taylor, Ev. § 640. See also
American Notes to same volume, page 427; 1 Gr. Ev. (16th
ed.) 198; 18 Am. & Eng. Enc. L. (1st ed.) 260; Abbott's Trial
Ev. (2d ed.) 117, § 36; Blackburn *v.* Crawfords, 70 U. S. 175.
The only assignment of error in the bill of exceptions which
was argued here complained of the rejection of evidence which
was, under the principles above referred to, clearly inadmissi-
ble; and therefore the judgment is

<div align="center">

*Affirmed.  All the Justices concurring.*